**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 07-CR-38-LRR |
| vs. | **ORDER** |
| OLIVIA ACOSTA-DELGADO, | |
| Defendant. | |

_____

*TABLE OF CONTENTS*

*I.  INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

*II. RELEVANT PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III. TRIAL EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

*IV. LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
    *A.*    **Brady** *Material* . . . . . . . . . . . . . . . . . . . . . . . . *12*
    *B.*    *Rule 33* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*

*V. DEFENDANT'S ARGUMENTS* . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*VI. ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
    *A.*    **Brady** *Material* . . . . . . . . . . . . . . . . . . . . . . . . *15*
    *B.*    *Rule 33* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*

*VII. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*

*I. INTRODUCTION*

The matter before the court is Defendant's Motion for New Trial ("Motion") (docket no. 64).

1

## II. RELEVANT PROCEDURAL HISTORY

On May 8, 2007, a federal grand jury returned a four-count Superseding Indictment against Defendant and her co-defendant, Celia Pizano-Mendoza ("Pizano-Mendoza"). Under 18 U.S.C. § 371, Pizano-Mendoza was charged in Count 4 with conspiring with Defendant to commit: possession of false identification documents, in violation of 18 U.S.C. § 1028(a)(4); sale of a social security card, in violation of 42 U.S.C. § 402(a)(7)(C); and possession of documents prescribed by law as evidence of authorized stay or employment in the United States, knowing the documents had been unlawfully obtained, in violation of 18 U.S.C. § 1546.

In Count 1, Defendant was charged with knowingly possessing an identification document not lawfully issued for her use with the intent that the document be used to defraud the United States, in violation of 18 U.S.C. § 1028(a)(4). In Count 2, Defendant was charged with knowingly selling a social security card that appeared to have been issued by the Commissioner of Social Security in the name of Jose Hernandez Gomez, Jr., in violation of 42 U.S.C. § 402(a)(7)(C). In Count 3, Defendant was charged with knowingly transferring, possessing and using without lawful authority, the means of identification of another person, in violation of 18 U.S.C. § 1028A(a)(1). In Count 4, Defendant was charged with conspiring to commit the crimes charged in Counts 1, 2 and 3 with Pizano-Mendoza, in violation of 18 U.S.C. § 371.

Anticipating that it would call Laura Mendoza-Pizano ("Mendoza-Pizano") and Pizano-Mendoza to testify at trial, on September 14, 2007, the United States filed petitions pursuant to 18 U.S.C. §§ 6002 and 6003 for orders compelling the testimony of these potential government witnesses. The same day, the court granted the petitions.

On September 17, 2007, Defendant filed a Motion to Dismiss. Defendant alleged that the Indictment should be dismissed because the Assistant United States Attorney failed to "formally provide any information" about a September 11, 2007 interview of Pizano-

Mendoza. In the Motion to Dismiss, Defendant complained that the government had not provided notes made by a law enforcement officer during the interview ("Notes"). She claimed that the government merely alerted her counsel by an email. Defendant did not file a brief or cite to any legal authority in her Motion to Dismiss. There was inadequate time prior to trial for the United States to respond to the Motion to Dismiss in writing.

On September 18, 2007, the court held a Final Pretrial Conference ("FPTC"). Defendant was personally present with Attorney Ta-Yu Yang ("Mr. Yang"). Assistant United States Attorney Richard Murphy ("AUSA Murphy") represented the United States. Defendant was assisted by two federally-certified Spanish-English interpreters.

At the FPTC, the parties argued the Motion to Dismiss, and the court denied it. During the FPTC, AUSA Murphy presented Mr. Yang with a copy of the Notes.

Also during the FPTC, the attorneys for Mendoza-Pizano and Pizano-Mendoza appeared outside the presence of the jury and on the record. Both attorneys stated their clients would assert their Fifth Amendment rights to remain silent if called to testify by either party.

The same day, after the FPTC, the jury trial commenced. On September 20, 2007, a unanimous jury found Defendant guilty on each of the four counts. Defendant testified during the trial.

On September 26, 2007, Defendant filed the instant Motion. On September 28, 2007, the court ordered Defendant to file a brief if she wanted the court to consider her Motion. On October 5, 2007, Defendant filed a four-page brief with scant citation to legal authority. On October 15, 2007, the government resisted the Motion (docket no. 70). Neither party requested oral argument and the court finds that it would not be useful in resolving the issues pending in the Motion.

The court finds the Motion is fully submitted and ready for decision.

## III. TRIAL EVIDENCE

A cooperating individual ("CI") was arrested for immigration violations in the United States by agents of the Bureau of Immigration and Customs Enforcement ("BICE"). In exchange for receiving a permit to remain and work in the United States for one year, the CI agreed to cooperate with BICE agents. BICE Agent Michael Fischels ("Agent Fischels") had instructed the CI to inquire in Marshalltown, Iowa about purchasing fraudulent documents. In mid-September of 2006, the CI told Agent Fischels that he made contact with a person named "Cesar"[1] in Marshalltown, Iowa, who said his Aunt Olivia could obtain identity documents for the CI to seek employment. Cesar gave the CI Cesar's cell phone number, which the CI called on September 12, 2006. Cesar then gave the CI Olivia's phone number, which was a land line in Marshalltown. Later on September 12, 2006, the CI made a phone call to the number he had been given for Aunt Olivia. Agent Fischels monitored the call, but the first call was not successful. The person who answered the phone said that Olivia was not there but that she would be back that evening.

During the evening of September 12, 2006, the CI called the number a second time. This second call was not monitored by law enforcement officers. The person who answered the telephone identified herself as "Olivia." When the CI said he was looking for "papers for work," Olivia asked the CI what age should be shown on the documents. The CI told her "twenty-one, twenty-three." The CI asked Olivia how much the work papers would cost. Olivia told the CI that the documents would cost $600. She said that $300 of the $600 had to be paid up front because she had to send some money to California to purchase the documents.

During the September 12, 2006 telephone conversation, the CI and Olivia made plans to meet on September 14, 2006. Olivia suggested that they meet at Hardee's in

---

[1] In this order the court will refer to the contact as "Cesar." The CI identified the person as "Oscar" but he told Agent Fischels the person's name was "Cesar."

Toledo, Iowa. That location was not satisfactory to Agent Fischels, because other BICE agents were planning to meet the CI at the Hardee's in Toledo. The CI told Olivia to meet him in the parking lot of the Super 8 Motel in Toledo ("Super 8").

On September 14, 2006, prior to arriving at the Super 8, Agent Fischels provided the CI with $300 in currency to be given to Olivia as a down payment on the identity documents. At about 12:15 p.m., the CI drove to the parking lot of the Super 8 in his green Tahoe. Olivia arrived in a red/burgundy Toyota Tacoma with California license plates. Agent Fischels and BICE Agent Suronen[2] were watching (with the aid of binoculars) from the lot of a neighboring gas station approximately 100 yards away. When Olivia arrived at the Super 8, the CI got out of his car and got into Olivia's car. The CI was in Olivia's car approximately five minutes, during which time he gave her the $300 down payment and viewed sample identity documents that Olivia showed him. According to the CI, Olivia told him he would receive the documents in one or two weeks. The CI got out of Olivia's car and drove away in his own car, and later he reunited with the two BICE agents. Olivia drove out of the lot and into the gas station where Agent Fischels had been watching the transaction. Olivia got out of the car and went into the gas station. Agent Fischels retreated to avoid detection and did not observe where Olivia went after she left the gas station. During the trial, both the CI and Agent Fischels identified the Defendant as the person who called herself "Olivia," whom the CI had paid $300 on September 14, 2006.

Following the September 14, 2006 meeting, the CI called Olivia several times to check on the documents. One time a person with a younger female voice answered and identified herself as Olivia's daughter.

On Saturday, September 30, 2006, Olivia called the CI to tell him she had possession of the documents. They decided to delay meeting until after the weekend. In

---

[2] BICE Agent Suronen's first name was never revealed at trial.

an October 2, 2006 telephone call, the CI and Olivia agreed to meet at the parking lot of the Super 8 on October 3, 2006.

On October 3, 2006, prior to meeting Olivia, the CI met Agent Fischels at the BICE office. Agent Fischels gave the CI $300 in currency to complete the transaction with Olivia; however, Agent Fischels did not participate further that day because of a knee injury. Rather, two other BICE agents, Todd Bonar ("Agent Bonar") and John Barfels, conducted surveillance that day. After the meeting with Agent Fischels, the CI drove to the parking lot of the Super 8. Olivia then arrived in the same red/burgundy Toyota Tacoma with California license plates. The CI testified this was the same person he had met on September 14, 2006, in that same location to give her the down payment.[3] Olivia gave the CI a birth certificate in the name of Jose Gomez, Jr. (Gov't Trial Ex. 1) and a social security card in the name of Jose Hernandez Gomez, Jr. (Gov't Trial Ex. 2). In return, the CI gave Defendant $300 in currency that was provided to him by Agent Fischels. BICE agents watched the transaction from the same gas station where Agent Fischels and Agent Suronen were posted on September 14, 2006. Agent Bonar testified that someone drove a red/burgundy Toyota Tacoma into the parking lot of the Super 8 and parked next to the CI's vehicle about 12:10 p.m. The CI got out of his vehicle and got into the red/burgundy Toyota Tacoma and sat in the passenger seat for about five minutes. Agent Bonar could not see the face of the single occupant of the Toyota Tacoma, but when he followed the red/burgundy Toyota Tacoma, the person drove it approximately two blocks to the Pioneer Seed Plant in Toledo ("Pioneer Plant"), which is adjacent to the Super 8. If a person were to drive from the Super 8 to the Pioneer Plant, the automobile would travel approximately two blocks. The driver got out of the vehicle and went into the Pioneer Plant. At that time Agent Bonar observed that the driver was a Hispanic female.

---

[3] During the trial, the CI identified Defendant a second time and testified that she was the "Olivia" from whom he had ordered and purchased documents.

During the transaction on October 3, 2006, Olivia told the CI she was going back to California because work was slow in Iowa. She gave the CI a cell phone number with a California area code. Agent Fischels testified that, following the October 3, 2006, transaction, other informants attempted to set up additional document transactions by calling the phone number Olivia had given the CI. One informant made contact with a person identifying herself as "Celia," who stated she could acquire other identity documents and that she would call the informant back. She did not. BICE Agents did not investigate further because resources were used in other investigations.

On both September 14, 2006, and October 3, 2006, Defendant was working as a hybrid seed corn sorter at the Pioneer Plant. Defendant stood at one of eighteen sorting tables equipped with conveyor belts, intercepting lower quality seed corn. Each table had three to four sorters working at any one time. Greg Tingley, the manager at the Pioneer Plant, testified that, according to the time card Defendant filled out on September 14, 2006, she took her lunch break from 11:45 a.m. to 12:15 p.m. On her time card for the week that included October 3, 2006, Defendant reported that she completed work for that day at noon. Mr. Tingley noted that formal attendance is only taken at the Pioneer Plant first thing in the morning. Sometime after lunch each day, a head count is taken, but there is no real way to determine accurately whether an employee was working at the exact time they reported. Mr. Tingley testified that all the times reported on a time card are rounded to the nearest quarter hour. Mr. Tingley also testified that employees at the Pioneer Plant can take breaks and walk away from a sorting table as long as there are sufficient other workers to handle the sorting. Cell phones can be taken into the plant and can be used when the employee is not working. A supervisor determines when the lunch break will take place each day. An employee can return to the Pioneer Plant after her shift has ended. Mr. Tingley testified that Pizano-Mendoza worked in the same department at the Pioneer Plant as Defendant, but he did not know if she was working the same shifts as Defendant.

Mendoza-Pizano, Pizano-Mendoza's daughter, of Bakersfield, California, testified that she was raised by Defendant and her mother, Pizano-Mendoza. Defendant and Pizano-Mendoza were domestic partners for approximately twenty years. At the time of trial, Mendoza-Pizano was facing her own immigration charges in California relating to making false statements. Mendoza-Pizano testified that people would go to Pizano-Mendoza and Defendant's apartment in Bakersfield and offer to sell them documents that other people could use to show eligibility to work in the United States. In 2006, Pizano-Mendoza asked her daughter to get an envelope containing a birth certificate and social security card from a girl named Vanessa in Bakersfield, pay Vanessa $200 and send the envelope to Pizano-Mendoza in Iowa. After the 2006 immigration raid in Marshalltown, Mendoza-Pizano told her mother to stop selling documents. Mendoza-Pizano identified her handwriting on Government Exhibit 4, a package containing fraudulent documents, and her sister, Consuelo's, handwriting on Government Exhibits 3 and 5, other packages containing fraudulent documents.

Mendoza-Pizano confirmed that Defendant owned a Toyota Tacoma. She testified that Defendant has two children. When Pizano-Mendoza and Defendant worked in Iowa, they stayed with Defendant's relatives. Mendoza-Pizano testified that her mother does not drive very often because she does not have a driver's license, but that her mother does know how to drive. If Pizano-Mendoza drove, she would have driven Defendant's Toyota Tacoma.

After the transactions on September 14, 2006, and October 3, 2006, Agent Fischels became aware of a mail watch [4] and investigation that BICE agents in the Southern District of Iowa had previously initiated that became relevant to this case. Government Exhibit 7,

---

[4] A "mail watch" involves a law enforcement agency's cooperation with the United States Postal Service to uncover contraband or other evidence of criminal activity transmitted through the United States Mail to and from a person under investigation.

a spreadsheet summary of mailings, shows the mail between Bakersfield and an addresses in Waterloo and Marshalltown. The address of 710 Brundage Lane in Bakersfield, California is a previous address of Defendant. Irma Acosta resides in Marshalltown and is the sister of Defendant. The address of 1505 South Fourth Street, Marshalltown, Iowa, is shown on the county assessor's website as belonging to Elizabeth Acosta, another sister of Defendant.

Agent Fischels testified that birth certificates and social security cards can be utilized to gain employment because they are evidence of a person's legal status or citizenship. They can also be used to obtain state photo identification cards that can also be used as proof of eligibility to work in the United States. The documents that Olivia delivered to the CI had been issued to real individuals. The advantage to having the documents of a real person is that when an employer attempts to verify employment information with a governmental agency, the employer is advised by the government that the social security number and driver's license number are valid, thus appearing to the employer that the individual is allowed to work in the United States.

When Defendant was arrested in California, Agent Fischels had an opportunity to interview her. At that time, the charges had not been filed in this district. Agent Fischels questioned her about the September 14, 2006, and the October 3, 2006, transactions with the CI. Defendant initially denied any knowledge of or involvement with the transactions. However, Agent Fischels testified at trial that Defendant quickly recanted her story and stated that she was present on September 14, 2006, and October 3, 2006, at the Super 8 and that she had conducted the transactions at the direction of her significant other, Pizano-Mendoza. Defendant claimed that she gave the $600 received from the CI to Pizano-Mendoza. Defendant told Agent Fischels that she was aware that Pizano-Mendoza had been selling other identity documents in the Marshalltown area.

Defendant testified at trial that she is 48 years-old and her partner Pizano-Mendoza

is 58 years-old. Both are Latino females. They have been mates and have lived together for fifteen years. Pizano-Mendoza has diabetes and is not able to work. She walks with a pronounced limp due to a bad leg and has difficulty getting in and out of automobiles. Although Pizano-Mendoza lacks a driver's license, she does drive Defendant's Toyota Tacoma. Defendant lives in California part of the year working in the agricultural fields. She also lives part of the year in Iowa working at the Pioneer Plant in Toledo. She has lived in Iowa with her sister, Elizabeth Perez Acosta, at 1505 South Fourth Street in Marshalltown. Her sister's telephone number is 641-753-3449. Defendant also had a cell phone with the number 661-364-3007. Defendant has another sister named Irma Acosta. She testified that she does not know a person named Maria Arevola, but she does recall that Pizano-Mendoza had telephone contact with a woman named "Maria" from Marshalltown. Defendant testified that Cesar is a man from her hometown in "Mexico." Defendant entered the United States illegally in 1976 and later became a lawful permanent resident. She testified that she realizes that she is subject to removal from the United States if convicted of the offenses.

Although her testimony at trial had inconsistencies, it is clear that Defendant denied being present at the Super 8 parking lot on September 14, 2006, and October 3, 2006, and she also testified that she did not sell documents to the CI. According to Defendant, it was Pizano-Mendoza who met the CI and engaged in the transactions on those days. Defendant denied ever meeting the CI or knowing him until he appeared to testify at trial. She denied telling the CI she was going to return to California within a day or so after the October 3, 2006, transaction. Defendant testified that she took Pizano-Mendoza to the bus station on October 4, 2006, so that she could return to California to sell documents and receive medical care. Defendant claims she stayed in Iowa working at the Pioneer Plant until February of 2007, at which time she returned to California as well.

During her trial testimony, Defendant admitted that she was arrested in April of

10

2007 in California on a California charge of fraud. She denied telling a California BICE agent that people involved with narcotics would sell birth certificates and social security cards to "them" to be resold to people who needed the documents to gain employment at meat factories. She admitted she was interviewed by Agent Fischels over the telephone when in custody in California, before the instant charges were filed, but she denied that he first read her *Miranda* rights. Defendant testified that, during the telephone interview, Agent Fischels threatened to take her papers away. Due to the threat, she was scared and she falsely told Agent Fischels that she gave the $600 to Pizano-Mendoza.

On cross examination, Defendant admitted she knew Pizano-Mendoza was selling documents. She testified that, in July of 2006, she knew Pizano-Mendoza was involved in selling documents because Pizano-Mendoza told her. She agreed to assist Pizano-Mendoza by filling out the address on an envelope relating to a document shipment because Pizano-Mendoza cannot write. She also lent her Toyota Tacoma to Pizano-Mendoza so Pizano-Mendoza could take the package to mail it, and she also allowed Pizano-Mendoza to use Defendant's cell phone for conversations relating to the documents. Defendant admitted that at the time she committed these acts, she knew Pizano-Mendoza was sending documents to be sold to people to use for work and that these people had ordered them from Pizano-Mendoza. She stated that she assisted Pizano-Mendoza because Pizano-Mendoza swore it was the last time Defendant would sell the documents.

On rebuttal, Agent Fischels testified that Defendant's trial testimony was the first time he had heard of her claim that, on October 4, 2006, she took Pizano-Mendoza to the bus station in Iowa to return to California. Agent Fischels also testified that the person he saw go into the gas station on September 14, 2006, after the transaction in the Super 8 parking lot, did not walk with a limp and did not have difficulty getting in and out of the Toyota Tacoma. Agent Fischels added that he has transported Pizano-Mendoza in the past, that she does walk with a pronounced limp and that she does have difficulty getting in and

11

out of automobiles. Agent Fischels also identified the telephone number 641-753-3449 (Defendant's sister's telephone number) as being the number given by Cesar to the CI to call to reach Olivia. Agent Fischels testified that the number 661-364-3007 (Defendant's cell phone number) is the number Olivia gave the CI to call regarding the document transaction.

## IV. LEGAL STANDARDS

### A. Brady *Material*

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, a defendant is entitled to a new trial if the government failed to disclose exculpatory evidence prior to trial. *See Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *United States v. Agurs*, 427 U.S. 97, 106-07 (1976) (holding that the prosecution has a duty to disclose exculpatory evidence even when defense counsel has not requested it). The Supreme Court explained in *Strickler v. Greene*, 527 U.S. 263 (1999), that, since *Brady*, it has

> held that the duty to disclose [exculpatory] evidence is applicable even though there has been no request by the accused, [*Agurs*, 427 U.S. at 107] and that the duty encompasses impeachment evidence as well as exculpatory evidence, [*United States v. Bagley*, 473 U.S. 667, 676 (1985)]. Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . .

527 U.S. at 280 (internal citations and quotations omitted). In other words, there are three elements of a *Brady* violation: (1) evidence favorable to the accused (2) that the government suppressed; and (3) such suppression resulted in prejudice to the defendant. *Id*. at 281-82. Evidence is considered "suppressed" if both "the government failed to disclose it in time for the defendant to use it . . . [and] the evidence was otherwise

12

unavailable to the defendant." *United States v. Barraza Cazares*, 465 F.3d 327, 334 (8th Cir. 2006). Specifically, "[w]here the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated." *United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996). In the Eighth Circuit, "*Brady* does not require pretrial disclosure as long as ultimate disclosure is made before it is too late for the defendant to make use of any benefits of the evidence." *Nassar v. Sissel*, 792 F.2d 119, 122 (8th Cir. 1986).

"Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule." *United States v. Conroy*, 424 F.3d 833, 837 (8th Cir. 2005) (citing *Bagley*, 473 U.S. at 676). "*Brady* applies equally to evidence impeaching the credibility of Government witnesses as well as to exculpatory evidence." *United States v. Kime*, 99 F.3d 870, 882 (8th Cir. 1996); *see also Giglio v. United States*, 405 U.S. 150, 153-54 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within [the *Brady* rule]." (Quotation omitted.)).

"Impeachment evidence is 'evidence favorable to an accused, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.'" *Conroy*, 424 F.3d at 837 (quoting *Bagley*, 473 U.S. at 676). Evidence is material for *Brady* purposes

> "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Id*. (quoting *Bagley*, 473 U.S. at 682). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also United States v.*

*Almendares*, 397 F.3d 653, 664 (8th Cir. 2005) ("The critical question, however, is whether the defendant received a trial resulting in a verdict worthy of confidence." (Citing *Kyles*, 514 U.S. at 434.)).

## B. Rule 33

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. However, "[m]otions for new trials are generally disfavored, *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002), and will be granted only where 'a serious miscarriage of justice may have occurred.'" *United States v. Rice*, 449 F.3d 887, 893 (8th Cir. 2006) (quoting *United States v. Huerta-Orozco*, 272 F.3d 561, 565 (8th Cir. 2001)). Indeed, "[t]he granting of a new trial under Rule 33 is a remedy to be used only 'sparingly and with caution.'" *United States v. Dodd*, 391 F.3d 930, 934 (8th Cir. 2004) (citing *Campos*, 306 F.3d at 579 in turn quoting *United States v. Lincoln*, 630 F.2d. 1313, 1319 (8th Cir. 1980)). Under Rule 33, district courts are granted broad discretion. *United States v. LeGrand*, 468 F.3d 1077, 1080 (8th Cir. 2006).

The newly discovered evidence rule entitles a defendant to a new trial if five factors are met, namely,

> (1) the evidence must have been discovered after trial; (2) the failure to discover this evidence must not be attributable to a lack of due diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted.

*United States v. Duke,* 255 F.3d 656, 659 (8th Cir. 2001).

## V. DEFENDANT'S ARGUMENTS

Defendant propounds two bases for a new trial. First, Defendant argues that the Notes are *Brady* material and amount to non-disclosed, material, exculpatory evidence that, if presented at trial, would have produced an acquittal. Second, Defendant argues that the Notes amount to newly discovered evidence, meriting a new trial under Rule 33.

## VI. ANALYSIS

### A. Brady *Material*

Defendant's reliance on *Strickler* and *Brady* is misplaced. There is no *Brady* violation here, because the government "disclose[d] [the Notes] in time for [Defendant] to use [them]." *See Barraza Cazares*, 465 F.3d at 334. The government provided to Defendant, at her counsel's request, a copy of the Notes at the FPTC on the first day of trial. Disclosure was "made before it [was] too late for [Defendant] to make use of any benefits of the evidence," *Nassar*, 792 F.2d at 122, and, therefore, Defendant cannot meet the test for a *Brady* violation.

### B. *Rule 33*

Rule 33 case law also offers Defendant no support. For Rule 33 purposes, Defendant's claim fails because "[a] motion for new trial based on newly discovered evidence cannot be granted, unless, among other things, the evidence is discovered after the trial." *United States v. Oberhauser*, 284 F.3d 827, 833 (8th Cir. 2002) (citing *United States v. Liebo*, 923 F.2d 1308, 1313 (8th Cir. 1991)). The inescapable fact, however, is that the Notes were provided to Defendant's counsel prior to the presentation of evidence on the first day of trial. In other words, the Notes do not meet the first factor of the *Duke* test, to wit, "the evidence must have been discovered after trial . . . ." *Duke*, 255 F.3d at 659.

## *VII. CONCLUSION*

The court **DENIES** Defendant Olivia Acosta-Delgado's Motion for New Trial (docket no. 64).

**IT IS SO ORDERED.**

**DATED** this 30th day of November, 2007.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA